WARREN G. KLEBAN ENGINEERING CORPORATION, Plaintiff,

Denton Roberts d/b/a Roberts Electric Company, Intervening Plaintiff,

v.

Thomas CALDWELL et al., Defendants.

No. WC 70–71–K.

United States District Court,
N. D. Mississippi, W. D.

June 26, 1973.

Dewitt T. Hicks, Jr., and Ralph E. Rood, Columbus, Miss., for Kleban.

Johnny N. Tackett, Aberdeen, Miss., for Roberts.

Lester McDonough, New Albany, Miss., Laurel G. Weir, Philadelphia, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this case, the Pontotoc County Board of Education and its superintendent (Board) are sued by Warren G. Kleban Engineering Corporation (Kleban) of Starkville, Mississippi, for losses allegedly arising from its failure to obtain the mechanical engineering work on a contract awarded by the Board to Lee Watson and Sons (Watson), general contractors of Hamilton, Mississippi, to construct two Pontotoc County 12-grade schools, one located at Ecru and the oth-

er at Springville.[1] Watson, the general contractor, was originally joined as a co-defendant. On February 22, 1971, Denton Roberts, d/b/a Roberts Electrical Company (Roberts) of Aberdeen, with leave of court, intervened to assert a claim against the Board and Watson for being denied an opportunity to perform the electrical work under Watson's contract. By its answers, the Board denied any contractual relation with either Kleban or Roberts and asserted that its dealings were exclusively with Watson as general contractor. Watson answered, also denying liability and asserting that although Kleban did submit the low bid for mechanical engineering, that firm was not awarded the subcontract because Kleban was not acceptable to the Board; Watson denied liability to Roberts on the gound that although it had solicited a bid for the electrical work from Roberts after Hankins, the original low bidder, was found unqualified, it had the right, once Kleban was rejected as mechanical engineering subcontractor, to substitute still another subcontractor, Central Electrical and Machinery Company (Central) of Tupelo, who submitted a lower and combination bid for both mechanical engineering and electrical work.

The court on August 4, 1971, entered a pre-trial order agreed to by all parties looking to the trial of the case in November 1971. Because of valid reasons, several continuances were granted by the court, thus delaying trial. Watson in March 1972 moved for summary judgment and shortly thereafter the court was presented an order dismissing Watson with prejudice, and the consent order was entered pursuant to stipulation approved by counsel for Kleban and Roberts.

Full evidentiary trial was conducted March 14, 1973. After the parties submitted proposed findings of fact and memorandum briefs, the court, having been presented with post-trial evidentiary materials in conflict with the previous pre-trial order, reopened the case and received further evidence May 30, 1973.

Since the commencement of this litigation, the two 12-grade schools, scheduled for completion August 1, 1971, have been constructed and placed into active use by the Board. Injunctive relief first sought has been abandoned but Kleban seeks a recovery for loss of profits ($57,000) on the project, estimate expenses in bidding ($4,800), and substantial damages both compensatory and actual, for injury to its business reputation; and Roberts seeks the recovery for loss of profits ($21,640) for not being the electrical subcontractor.

The Board hired William I. Rosamond and Associates (Rosamond), a well-known architectural firm of Columbus, to prepare plans and specifications on the two-schools project. On the basis of detailed plans and specifications, the Board invited sealed bids by contractors to be opened and publicly read September 29, 1970, at 2 o'clock, p. m., in the Board's office at the City of Pontotoc. Bidders were solicited to 'bid for general construction, including plumbing construction, mechanical construction, electrical construction, and site improvements for two 12-grade schools, Project 'A' and Project 'B'." The bid invita-

---

1. Suit was originally begun December 12, 1970, in the Chancery Court of Monroe County, and removed to federal district court because of this court's prior orders entered in WC 70–71–K styled United States of America, plaintiff, v. Pontotoc County School District, et al, defendants, desegregating the county schools, ordering the construction of the two school buildings after resolving disputes concerning building sites, and granting other injunctive relief. Although no party has questioned our jurisdiction, we conclude that we are vested with ancillary jurisdiction to determine the present controversy because of the many-faceted aspects of the prolonged litigation aimed at establishment of a unitary school system in Pontotoc County, as reflected by the extensive prior hearings and various injunctive orders of this court, which we judicially note. Wright, Law of Federal Courts, 2d Ed., § 9, p. 19.

tion specifically recited that the proposed work would be awarded either as one lump-sum contract covering both schools or as two separate one-lump-sum contracts for each school. The Board reserved the right to reject all bids, also advising bidders "that any person, firm or other party to whom it is proposed to award a subcontract must be acceptable to the owner and the architect." The form of bid proposal supplied by the Board's architect provided that bidders should complete a separate form headed "Data on Specialty Items", in which the bidder was instructed to list a breakdown of his general bid, together with the names, if any, of the subcontractors.[2] The bidder was advised that the amounts of any such subcontracts should not include any general contractor's overhead and profit and that a separate sheet on these specialty items should be properly filled out and submitted with the bidder's bid but in a sealed envelope separate from the envelope containing the general bid. Watson did not submit a bid for each of the schools (Projects A and B), but only a lump-sum proposal to construct both schools.[3] Watson testified that in preparing his firm's bid he relied upon a mechanical engineering proposal of $347,500 submitted by a Mr. Lundy although he had also received from Kleban a higher proposal of $350,000, and for electrical construction upon a $152,000 proposal from Hankins Electric Company. Only several minutes before its bids were actually delivered, however, Watson conferred with Kleban, who reduced its mechanical proposal to $347,000; Watson then hurriedly filled out the specialty data sheet naming Kleban as the successful mechanical engineering contractor for $350,000 [4] and Hankins as the successful electrical contractor for $152,000. The Board opened the various general contractor bids but no award was immediately made since all bids exceeded available funds. The sealed envelopes containing the data on specialty items, including those submitted by Watson, were not opened by the Board but were confidentially retained by Rosamond and later opened at his Columbus office. The next day, Rosamond contacted Watson and proceeded to negotiate a contract with that firm, by taking alternate deductions and issuing certain change-orders. Hankins, the low bidder for the electrical work, was determined to be unqualified, not having a certificate of responsibility, and Watson, with Rosamond's concurrence, negotiated with Roberts, who submitted a bid of $165,915.87. Further negotiations for the mechanical engineering took place between Watson and Kleban, with Rosamond's approval, and resulted in a new proposal by Kleban for $330,000. On October 23, Watson submitted Kleban and Roberts to Rosamond, the Board, and the State Educational Finance Commission for approval as the proposed mechanical engineering and electrical subcontractors. The Board, on October 28, acting through its Superintendent Richard C. Ball, disapproved Kleban as mechanical subcontractor without assigning reasons but relying upon references contained in the specifications. No mention of Roberts was made.

2. This breakdown, depending upon whether the bidder made a lump-sum bid for either or both of the schools, called for information pertinent to this case as follows:
   (a) Amount of plumbing construction and name of subcontractor;
   (b) Amount of mechanical construction (heating, ventilation and air conditioning) and name of subcontractor;
   (c) Amount of mechanical utilities and name of subcontractor;
   (d) Amount of electrical construction and name of subcontractor.

3. Its original bid was $1,972,000, of which $799,000 was allocable to Ecru and $1,173,000 to Springville.

4. Watson actually submitted to Rosamond two lump-sum proposals for all mechanical work from Kleban, one for $350,000 and one for $347,000. This discrepancy is without consequence and merely indicates the sequence of negotiations between Watson and Kleban.

Watson was notified to submit an alternate mechanical subcontractor for the Board's approval. Watson subsequently submitted Central as the combined mechanical engineering and electrical subcontractor, and this firm was approved by the Board and Rosamond.[5] The Board thereupon proceeded to enter into construction contracts with Watson for a total consideration of $1,612,889.44; of this amount $638,873.22 was allocated to Project "A", Ecru, and $974,016.22 to Project "B", Springville.[6]

Rosamond on October 29 notified Watson to proceed with work under the contracts executed by the Board. After the ground-breaking, Kleban requested that the architect and Board reconsider its rejection as mechanical subcontractor. This request, accompanied by a list of references, was made by letter dated November 6. The Board granted Kleban a hearing, which was held November 12. At that time Kleban and his attorney appeared before the Board, submitted references and presented their case; at the conclusion of this hearing the Board adhered to its decision of disapproval.

Superintendent Ball, when advised that Kleban was the mechanical subcontractor proposed by Watson, made inquiry of several sources,[7] and formed the opinion that Kleban was unsatisfactory because of its tendency to be uncooperative with other contractors, slow in performance, and with a reputation for being contentious as to materials

meeting specifications. Ball's recommendation of disapproval was accepted by the Board because it deemed time to be very much of the essence in view of the badly needed schools, the threat of loss of accreditation by state agencies because of the inadequate existing facilities, as well as the presence of the federal court order requiring establishment of a unitary school system as soon as possible. The Board, a body composed of merchants and farmers without building experience, relied upon Ball's report and recommendation. Rosamond, while feeling that Kleban was a competent mechanical subcontractor, left it to the Board to make the final decision and acquiesced in its disapproval of Kleban. Roberts was neither approved nor disapproved by the Board as electrical subcontractor; Watson, in effect, withdrew him as his subcontractor by submitting Central as the subcontractor to do the electrical as well as the mechanical engineering work.

Kleban contends that since it was tendered to the Board by the general contractor as the successful mechanical engineering subcontractor with the affirmative recommendation of the architect, the Board was without power to reject Kleban except after due consideration and upon reasonable grounds, as dictated by the AIA (American Institute of Architects) General Conditions which Kleban contends to be, by reference, a part of the specifications (B–1); [8] that Kle-

5. At trial it developed that Central's bid for the combined mechanical and electrical work was $30,000 less than the total of the Kleban and Roberts bids, but this reduction in price was not credited against the Watson bid price as general contractor. Watson seeks to justify this by asserting that Hankins' original bid, which was used to calculate the electrical cost, was erroneously low.

6. This was an overall reduction of $359,110.56 from Watson's original bid (Fn. 3), and resulted from the Board's taking certain alternate deductions submitted as a part of the bid and issuing change orders. This was done to bring the project within available funds.

7. These sources included certain engineers, contractors, and owners' representatives of three projects on which Kleban had been awarded mechanical engineering subcontracts, to-wit: Ruth's Department Store at Columbus, Golden Triangle Vo-Tech Center at Mayhew, and Dairy Science Building at Mississippi State University.

8. AIA General Conditions in pertinent part provide:
   "Unless otherwise specified in the Contract Documents or in the Instructions to Bidders, the Contractor, as soon as practicable after the award of the Contract, shall furnish to the Architect in writing for acceptance by the Owner and

ban, a competent subcontractor fully capable of doing the type of mechanical engineering involved in the relatively simple two-schools project, was rejected arbitrarily and without cause; and also that the Board, by its action, exceeded its statutory authority by failing to record on its minutes the reason for disapproving Kleban as the mechanical engineering subcontractor.[9] Similarly, Roberts contends that since he was tendered to the Board as the successful electrical contractor and was never rejected either by the architect or the Board, the Board became legally obligated to him and ignored his position only at its peril. Denying these contentions, the Board asserts that by advertising for construction bids in the manner that it selected and by receiving bids from general contractors, it entered into no contractual relations with subcontractors making proposals to a general contractor; that it had no concern with, or control over, the price paid to subcontractors selected by the successful general contractor, as the making of subcontracts, if any, was a matter entirely between the general contractor and his proposed subcontractors; and the Board reserved a right to disapprove subcontractors proposed by the prime contractor. It urges that the specifications vested it with the unrestricted power to disapprove.[10] The Board further asserts that there was a reasonable factual basis for rejecting Kleban as the mechanical engineering subcontractor and, as for

Roberts, it was not responsible for Watson's independent action which substituted Central for Roberts to do the electrical work, and Roberts' claim, if any exists, is solely against Watson.

■ The question here presented is whether the Board became obligated to deal with subcontractors proposed by the successful general contractor under the circumstances shown by the record. The substantive law of Mississippi, of course, governs the case. Basic in our consideration are certain well-settled principles, recognized both generally and in Mississippi, relative to the award of contracts for public works. First, the rules which govern bidding for public contracts are analogous to auction sales in that the bid, and not the call or advertisement for bids, is the offer, but even the bid ordinarily creates no rights until accepted. 64 Am.Jur.2d, Public Works and Contracts, § 30, p. 882. Thus, an advertisement being nothing more than a solicitation of bids, does not of itself impose any contractual obligation. Second, public officers in awarding contracts for the construction of public works perform not merely ministerial functions but duties of a judicial or discretionary nature; and the courts, in the absence of fraud or a palpable abuse of discretion, ordinarily will not interfere with their decisions as to the details of entering into a contract or the acceptance of bids therefor so long as the public officers conform to the requirements of controlling constitutional

the Architect a list of the names of the Subcontractors proposed for the principal portions of the Work. The Architect shall promptly notify the Contractor in writing if either the Owner or the Architect, after due investigation, has reasonable objection to any Subcontractor on such list and does not accept him. Failure of the Owner or Architect to make objection promptly to any Subcontractor on the list shall constitute acceptance of such Subcontractor."

9. Kleban relies upon Miss.Code § 6231–02 (Supp.1971), which regulates the awarding of contracts by a school board upon competitive bids, directs that contracts be made to the lowest and best

bidder and further provides in relevant part: "Provided, however, [that] when such school board [shall] not let contracts to the lowest bidder . . . the reasons therefor shall be recorded on the minutes of the school board." The minutes of the school board in this case are silent as to the reasons for rejecting Kleban and for failing to approve Roberts.

10. Information to Bidders, ¶ 3(a–1) reads: "The bidder is specifically advised that any person, firm, or other party to whom it is proposed to award a subcontract under this contract must be acceptable to the owner and the architect."

or statutory provisions. Ibid § 64, p. 918. Lastly, while statutory provisions often require that contracts be awarded to the "lowest and best bidder",[11] officials may properly consider a number of factors beside price, such as the bidder's skill and business judgment, his experience and his facilities for carrying out the contract, his previous conduct under other contracts and the quality of previous work—as well as his pecuniary ability, honesty and integrity. Ibid § 70, pp. 927–28. These principles were comprehensively discussed by Chief Justice Ethridge in Parker Bros. v. Crawford, 219 Miss. 199, 68 So.2d 281 (1953), a case upon which all parties rely, and were recently reaffirmed in Walley v. Board of Trustees of Richton Municipal Separate School District, 241 So.2d 644 (Miss.1970).

As stated, the Board solicited bids or firm proposals from prime contractors only, distinctly specifying that the work would be let either as a single lump-sum contract for both schools or as separate lump-sum contracts for each of the two schools. No bid was solicited for a portion of the work, as the bid by general contractor had to cover all phases of the construction, his option being to bid on one or both schools. It is certain that the Board did not propose to contract with specialists or become obligated to subcontractors. This conclusion must be mandated by the specifications and form of bid proposal unless a different result obtains merely because bidders were directed to identify, by name and price, proposed subcontractors, if any. Plaintiffs argue that since the general contractor had to disclose this information, those subcontractors proposed by the successful general contractor should have status equal to that of the general contractor submitting the lowest and best bid, i. e., that they cannot be rejected (or ignored) except for reasonable grounds, which they assert did not exist in this case.

■ We note that in *Parker, Walley* and other cases cited by plaintiffs, the Mississippi Supreme Court was concerned with the school board's rejection of bids by contractors, and not with proposals by subcontractors submitted to a bidding contractor. We are not persuaded that the *Parker* rule should extend to persons other than those who directly submit bids to school trustees or public officers pursuant to express invitation. Neither Kleban nor Roberts did so, and the Board was without power to *require* Watson to accept their proposals. Unlike some states, Mississippi has no statute which forbids the successful prime contractor on a public contract from shopping among subcontractors after the opening of bids.[12] The Mississippi statutes referred to do not, in our opinion, encompass subcontractors as bidders where the public authority itself does not receive bids from them. Since the Board was not to let contracts to Kleban or Roberts, the statutory requirement that reasons for their rejection be spread upon official minutes does not apply.

■ Kleban next presses the claim that, apart from statute, the specifications which the Board adopted imposed upon it an obligation to accept the subcontractors proposed by Watson as successful bidder unless there was "reasonable objection" after "due investigation", as recited in AIA General Conditions (5.2.1. Fn. 8); and it asserts that this provision prevented the Board from disapproving a subcontractor without adequate reason. The Board suggests that other clauses in the General Condi-

11. This statutory language appears not only in Code § 6231–02, cited by plaintiffs (Fn. 9), but also in § 6247–08 (Supp.1971) governing capital improvements made by any school district financed in part, as was the Pontotoc schools project, by funds from the state public school building fund pursuant to application approved by the State Educational Finance Commission.

12. See, for example, the California statute discussed in Southern Calif. Acoustics v. C. V. Holder, Inc., 71 Cal.2d 719, 79 Cal.Rptr. 319, 456 P.2d 975 (1969).

tions and Bid Information convey a different meaning, and bestow an unfettered power of disapproval. Section 5.-1.3 of General Conditions provides "nothing contained in the contract documents shall create any contractual relation between the owner and any subcontractor." Information to Bidders (¶3 3–1) specifically provides that any proposed subcontractor "must be acceptable to the owner". We believe that the several clauses, when construed together, vest the Board with the power to reject a proposed subcontractor so long as it acts in good faith and upon a reasonable basis. To this extent, the specifications do afford a measure of protection to successful subcontractors not granted by the State's statutory or case law. This conclusion, however, is not dispositive of the issues because of the particular facts shown by the record.

■ The clause in the bid instructions that bidders should complete a separate form headed "Data on Specialty Items" (Fn. 2) was inserted by the architect. As Rosamond testified, the information thus elicited was kept by him confidentially and not submitted to the Board at the time of bid opening. Rosamond emphasized that such details were of no interest to the Board but were sought by him in aid of a three-fold purpose: (a) to encourage general contractors not to shop for lower subcontract proposals after bids were opened; (b) to enable the architect to calculate the fee to be paid by him for structural engineering services on specialty items; and (c) to enable the architect to anticipate costs on other projects in the future. In fact, Watson did not wholly comply with the directions since it failed to list separately the items of plumbing construction, mechanical construction (HV&A/C) and mechanical utilities; instead, he gave only a gross price and the name of one subcontractor for all three items; and he submitted another firm, not Roberts, as the electrical subcontractor. The evidence discloses that it was up to the general contractor to do his own negotiating with various spe-

cialists of his choice, the Board having no control over the character or duration of the negotiation. In preparing the submission of its bid, Watson obtained informal proposals from different subcontractors offering the same service, and notwithstanding the listing confidentially submitted, Watson continued to have discussions with them. Neither Watson nor those with whom it dealt regarded themselves bound by firm proposals, or that their negotiations were frozen by the opening of bids. This is emphasized by the fact that proposals from both Roberts and Central were solicited by Watson after bids were opened. Watson, not the Board, chose Central over Roberts for the electrical portion of the work. It would be unjust to hold the Board liable to Roberts merely because it acquiesced in, or failed to object to, a decision which Watson made in its own pecuniary interest. Roberts' claim, being without merit, must fail.

■ As regards Kleban's claim, the facts are somewhat different. Kleban submitted the "lowest and best bid" as mechanical engineering subcontractor and would have been used except for the Board's disapproval. Assuming Kleban had status protected by the specifications, it does not necessarily follow that the Board incurred liability to Kleban by rejecting it as a proposed subcontractor for the Board did find Kleban unacceptable upon adequate grounds. Although it is without serious dispute that Kleban was an experienced and competent engineering firm, financially able to carry out its commitments, nevertheless the Board justifiably had a special concern for the prompt performance of the contracts and securing cooperative subcontractors to expedite the work. Time was very much of the essence in the erection of these two widely separated major school buildings, designed to house all students attending public schools under the Board's jurisdiction. The specifications required a completion date by August 1, 1971, allowing the general contractor, and his subcontractors, no more than nine months within

which to have the buildings ready for occupancy at the beginning of the 1971–72 school year. The Board was under federal court mandate to desegregate its schools without continuing delay. That order had recognized the necessity for new buildings to accomplish meaningful desegregation and also to avoid impending loss of accreditation by state school authorities on account of wholly inadequate physical facilities. Confronted by such demanding circumstances, the Board was understandably apprehensive as to likely sources of difficulty which might produce delay. Without elaborating on the evidence, it is sufficient to say that the Board and Superintendent Ball in disapproving Kleban did not act from bias, spite or animosity, but upon judgment that Kleban, on the basis of past jobs, might well slow the progress of construction and make it difficult to meet the firm deadline fixed by the Board. The Board was concerned with Kleban's reputation for promptness in performance and for having a cooperative attitude in working with other contractors. The expressions of dissatisfaction which the Board received concerning the firm's performance on other jobs cannot be dismissed as irrelevant, and were proper for the Board to consider. It is not for this court to say that the Board reached the correct conclusion on the basis of its investigation, but it is enough for us to conclude, as we do, that a factual basis did exist for its decision. The factors which were of concern to the Board are of sufficient substance to preclude this court from finding that the Board acted arbitrarily or capriciously and that it should be cast in damages for its decision. School trustees should be accorded reasonable latitude in the discharge of important duties which they render on behalf of the public. When all of the considerations are weighed, the court holds that the Board did not exceed the bounds of reasonable discretion, and acted in good faith when it determined that Kleban was not acceptable as a subcontractor.

For the above reasons, the claims of both Kleban and Roberts should be denied and their complaint dismissed with prejudice.

Let an order be entered accordingly.